**STATE, Plaintiff-Appellee, v. PARRETT, Defendant-Appellant.**

Ohio Appeals, Tenth District, Franklin County.

No. 5654.   Decided March 15, 1960.

Earl W. Allison, Pros. Atty., Fred Newsom, Asst. Pros. Atty., Columbus, for plaintiff-appellee.

Harold Shurtz, Columbus, for defendant-appellee.

(McLAUGHLIN, J, of the Fifth District, sitting by designation in the Tenth District.)

## OPINION

By BRYANT, PJ.

This is an appeal in a criminal case.   Harry Parrett, defendant-appellant, was found guilty of murder in the second degree by a jury in the Court of Common Pleas of Franklin County, Ohio.   It was alleged by the State, plaintiff-appellee, that Parrett inflicted fatal stab wounds on Adam Bojaski during a free-for-all fight in a tavern.   The fight was alleged to have occurred at about 2:00 A. M., Saturday, December 1, 1956, in the Pink Poodle Cafe, a liquor spot, located at 1816 Parsons Avenue, Columbus, Ohio.   The verdict of the jury was returned February 15, 1957, following a three-day trial and the lower court forthwith sentenced Parrett to life imprisonment in the Ohio Penitentiary.   A motion for a new trial was filed by the defendant on the following day and on February 19, 1957, this motion was overruled, execution of sentence was ordered and shortly thereafter Parrett was delivered to the Ohio Penitentiary where he has remained during the more than two years since.

On March 19, 1957, Parrett filed a notice of appeal to this court and also filed a precipe for a transcript- of docket and journal entries and original papers to be filed in this court. By March 22, 1957, all steps necessary to perfect the appeal had been taken including the filing of a bill of exceptions, its approval by the trial court and transmittal to this court.

At the time of his arraignment, Parrett, who was only eighteen years of age, pleaded not guilty and court-appointed counsel was named to represent him. Sometime after the perfecting of the appeal, as above indicated, court-appointed counsel was replaced by counsel privately employed. New counsel on April 27, 1957, withdrew for study the entire official file including the bill of exceptions. It was subsequently reported to the court that this entire file had disappeared, new counsel stating that shortly after taking the file, an attorney assisting him, removed it and the bill of exceptions from the attorney's office for study and that neither was ever returned. It was reported that this attorney became ill (impairment of nervous system) and remained ill for a long period of time during which many unsuccessful efforts to locate either the sick attorney or the file were made. More recently it was reported to the court that the missing attorney regained his health but did not return any part of the file reporting that he had taken it late one Sunday night to some guard or watchman at the court house.

At the direction of the court, the lower court was ordered to make every effort to reconstruct and complete this file so far as possible to prevent the almost intolerable delay from continuing. At the request of the court, Prosecuting Attorney Earl W. Allison, with a most commendable spirit, made available carbon and therefore exact copies of the indictment, the bill of particulars, the bill of exceptions and other papers in his official file. The Clerk of Courts prepared a new transcript and new copies of all pertinent records available in this case. Pursuant to a time schedule ordered by the court, counsel for the defendant between November 20, 1959 and December 11, 1959, filed assignments of errors and the various briefs. The matter was set down for argument before the full court but counsel for the defendant and for the State filed an entry waiving oral argument.

The indictment omitting the purely formal parts charges "that Harry Parrett late of said County, on or about the 1st day of December in the year of our Lord, one thousand nine hundred and fifty-six within the County of Franklin aforesaid, did purposely and maliciously kill Adam Bojaski, contrary to the statute, etc. * * *."

Pursuant to demand on behalf of Parrett, the State filed the following bill of particulars:

"The State of Ohio expects the evidence to show that the defendant Harry Parrett:

"(1) Killed one Adam Bojaski by stabbing him with a knife in the chest while the defendant Harry Parrett and Adam Bojaski were in the Pink Poodle Cafe located at 1816 Parsons Avenue in the City of Columbus County of Franklin, State of Ohio, between the hours 1:00 A. M. and 6:00 A. M. on the morning of December 1, 1956, and that said Adam Bo-

jaski died as a result of the stab wounds purposely and maliciously administered by the defendant Harry Parrett."

As above indicated the fatal wound was inflicted in a southside drink spot called the Pink Poodle Cafe. Harry Parrett, who was eighteen years of age at the time, weighed one hundred twenty-eight pounds and was five feet five inches tall. The victim, Adam Bojaski, was twenty-two years of age, weighed one hundred forty pounds and was five feet nine and one-half inches tall. (R. p. 108.) Bojaski had lived most of his life in Logan, West Virginia (R. p. 15) except for two years in the Armed Forces of the United States and the six weeks he had lived in Columbus just prior to the fatal cutting.

It appears that on the the evening before the fight, Parrett had a date with his girl friend and about the hour of midnight took her home. On his way to his own home, Parrett stopped at the Pink Poodle Cafe about 12:30 A. M. At a table near the rear of the tavern he joined two friends, Mr. and Mrs. Richard W. Hunter, Jr., and shortly thereafter Janet Black, age seventeen, sat down at this table. Parrett had been in the tavern on other occasions and was also acquainted with Edward Santucci, the owner-manager, Carl Weber, who assisted the bartender, William Dennison, also known as "Whitey," Robert Johns and others, who were present that night.

Parrett testified that on the day previously he had been hunting and that a hunting knife having an overall length of eight and one-quarter inches and a blade four and one-fourth inches long, remained in his topcoat pocket. While at the table, he gave this knife to Mrs. Hunter for safekeeping and she put it in her purse returning it to him when Parrett announced his intention to go home.

There was another table next to that occupied by Parrett and beyond that there was a telephone booth. At approximately 1:30 A. M. four men entered the Pink Poodle Cafe and sat at the other table. One of them was Bojaski. The others were Henderson Dingess, Warren New and Willie Wilson. All four men had viewed the Friday night television fights up to about 11:00 P. M. after which they set out together to do some drinking. Apparently between 11:00 P. M. and 1:30 A. M. they had been imbibing at another drink spot. (R. p. 34.) After serving one round of drinks to the four men in the Pink Poodle Cafe, Santucci, the manager of the Pink Poodle Cafe, shut off the drinks of all four of them. New apparently was up and down frequently moving about the tavern. There was testimony at the trial that soon after the arrival of the four men, friction developed between the occupants of the two tables. Witnesses at each of the tables testified there was considerable eyeing or staring going on. Parrett testified that one of the four men made improper remarks concerning Mrs. Hunter.

There was testimony that Parrett sensed an impending battle and relaid that information to those at his table and to Weber, Dennison and Johns. One of the adults, Willie Wilson, was a very large muscular colored man with ten years service in the Armed Forces of the United States. He was at the time stationed at Lockbourne Air Force Base Wilson testified (R. pp. 23 and 24) that there was considerable staring and that he, Bojaski and Dennison spoke about it.

**4**

Regardless of what looks or words were exchanged, it was crystal-clear that the fight broke out in the vicinity of the telephone booth. Weber testified that the phone rang and he went back to answer it (R. p. 69), and that Parrett took no part in the beginning of the fight. With reference to the striking of the first blow, Weber testified on direct examination (R. p. 70) that he saw the four men "was going to start a fight so I just hauled off and hit one guy and then this big colored guy hit me and knocked me down." He states positively that he struck the first blow (R. p. 70) and there was also evidence that a ring of ten or more young men formed around the table occupied by the four. Willie Wilson testified that he got separated from his three companions and fought his way out holding one chair over his head and whirling another chair in front of him. He was hit by ·a beer bottle in the back of the head as he went out the front door. Dingess was hit over the head and was removed to the hospital. New was not called as a witness. Bojaski was badly cut, fell to the floor and was removed to Mercy Hospital where he died apparently while being operated on.

No witness called by the State or the defense, except Parrett, testified that he saw the fatal blow struck or whether Bojaski or Parrett was the aggressor or whether or not, as Parrett claimed, Bojaski was armed with a broken beer bottle in one hand and another bottle in the other, or whether, while so armed, Bojaski twice lunged at Parrett slashing at him with the broken beer bottle. There simply was an absence of any evidence of any eye witness except Parrett, although the tavern appears to have been crowded that night. Fourteen witnesses were called but five of them were police officers and one was a physician, who gave medical testimony, and none of these six was present in the tavern at the time of the fight. The only testimony offered on behalf of the State as to the circumstances surrounding the stabbing was from witnesses who repeated statements allegedly made by Parrett. These witnesses included Parrett's friends or the Columbus police.

After the fight was over, Parrett took several of his friends home. One of them took the fatal weapon from Parrett and attempted to dispose of it by throwing it into a sewer nearby from which it was recovered the next day by the police.

Parrett at no time denied that his knife inflicted the fatal wound on Bojaski but contended he was terrified when Bojaski, who was four years older and nearly five inches taller and twelve pounds heavier, made a savage attack upon Parrett slashing at him with the jagged edges of a broken beer bottle held in one hand and holding another beer bottle in the other hand. Parrett described two such rushes or attacks by Bojaski, stated he cut Bojaski once or twice and that on the latter occasion Bojaski fell against him.

The testimony by prosecution witnesses conflicted sharply as to the number of stab wounds suffered by Bojaski, was somewhat confusing and drew comment from the trial judge. The officer assigned to the police ambulance who applied sutures to the stab wounds as Bojaski lay on the floor at the Pink Poodle Cafe said there were three such cuts in the chest. The detective who viewed Bojaski on the emergncy table at Mercy Hospital with his clothing stripped off to the waist also said

there were three such cuts. The coroner of Franklin County was not called as a witness. Medical testimony was given by the chief officer of the Ohio State University autopsy service. Unfortunately, on cross-examination, this official admitted he had never seen the whole body of Bojaski but only the injured organs of Bojaski (plus photographs), and that the so-called official report to which he made frequent references was dictated by some one other than himself. He described in detail five stab wounds, four of which were minor cuts piercing only the skin and flesh and not entering the muscle or the organs below, while the fifth wound was described as the fatal blow puncturing the right ventricle of the heart.

Seven errors are assigned on behalf of Parrett. However, in the present state of the record it appears that we must first give attention to the seventh error assigned which refers to "other errors apparent on the face of the record." In the first place, from the examination of the docket and journal entries and particularly the clerk's entry of the court's sentence beneath which the name of the trial judge is appended, we learn that Parrett, presumably after the jury verdict of guilty, withdrew his former plea of not guilty and entered a plea of guilty to murder in the second degree as charged in the indictment. The entry referred to reads as follows:

"This day again came the prosecuting attorney on behalf of the State of Ohio the defendant being in court in custody of the sheriff. Trials by Jury Verdict 'Guilty.'

"**Thereupon the defendant retracts his plea of not guilty heretofore entered and for plea to said indictment says he is guilty in manner and form as he stands charged therein,** and being inquired of, if he has anything to say why judgment should not be pronounced against him, and having nothing but what he hath already said, it is the sentence of the court that the defendant Harry Parrett pay the costs of this prosecution and be imprisoned in the Ohio penitentiary and kept at hard labor, but without solitary confinement, and that he stand committed until discharged according to law, for Life." (Emphasis ours.)

However, this is not supported by the bill of exceptions nor it is supported by the entry made upon the bench docket of the trial judge, this entry reading as follows:

"Trial proceeded and concluded, Jury returned a verdict of Guilty as he stands charged in the Indictment to Murder in the Second Degree and Defendant sentenced to the Ohio Pen for Life according to law and to pay costs of prosecution."

It is not contended by counsel for either side that Parrett ever in fact did plead guilty and all counsel agree that Parrett never did plead guilty. If he had made such a plea, this appeal would have to be dismissed for all of the errors complained of relate to the trial. This then appears to be a serious error which, if unchanged, will deny Parrett the right to an appeal. That is a substantial right and must be preserved and we therefore have no choice but to determine that the seventh assignment of error, so far as it relates to this non-existent plea of guilty, is well taken and must be sustained and the cause must be returned to the court below for further proceedings according to law.

The prosecution sought to emphasize communication between Parrett and a number of his friends prior to the fight and by its questioning sought to prove steps alleged to have been taken by Parrett to obtain a concert of action. To accomplish this, the State called many of Parrett's friends as witnesses under which circumstances, instruction to the jury with reference to the law as to the testimony of conspirators was called for but was not given, a circumstance of the greatest importance to Parrett.

Examination of the record, however, discloses other errors apparent on the face of the record, which in our judgment cannot be corrected without a new trial.

As above pointed out, the indictment in this case charged murder in the second degree and in such cases the jury is required to be given a carefully worded charge as to the crime charged, together with the included crimes.

The line of demarcation between murder in the second degree and manslaughter is at best one difficult to determine and matters having to do therewith are of the highest important. Hence an error of commission in the charge whereby the trial court erroneously informed the jury that the charge in fact was murder in the first degree is of first importance.

Near the bottom of the first page and the top of the second page of the court's charge to the jury, there appears the following:

"**The indictment in this case charges the Defendant, Harry Parrett, with the crime of murder in the first degree.** It also includes and embraces in its terms the crime of - - - crimes of manslaughter and several minor offenses which this Court will not charge you on.

"Before a conviction of homicide can be had under this indictment, there are certain essential elements of the crime which must be established by evidence introduced on the part of the State which convinces your mind of guilt beyond a reasonable doubt. * * *"

So far as we can ascertain, this was never recognized as a mistake nor was any correction of it ever given to the jury. On the sixth page of the charge a conflicting statement appears reading as follows:

"Murder in the second degree, which is the crime charged by this indictment, is defined by law as follows: * * *"

This is followed by the statutory definition and definition of purpose, malice and other elements of the charge followed by reference to two kinds of manslaughter and their elements.

We need not consider here whether or not an error of this type could be corrected in the record. The fact is it was not so corrected and the jury in one breath was told that Parrett's crime was murder in the first degree while five pages later in the charge it was called murder in the second degree. In our judgment this error. which is apparent on the face of the record. was highly prejudicial to the defendant and deprived him of a fair trial and necessitates the reversal of the judgment and sentence of the court below.

Because of the decision we have reached we shall not give detailed consideration to the other errors apparent on the face of the record other than to direct attention to testimony by a police officer (R. pp.

144 and 145), wherein the police officer who talked to the victim in the hospital without qualifying the statements of the decedent as dying declarations, was permitted to state a conclusion reached by him that Bojaski's description of his assailant fit the defendant in this case.

For the reasons above set forth, the judgment and sentence of the court below will be reversed and set aside and the cause remanded to the court below for further proceedings in accordance with law.

DUFFY and McLAUGHLIN, JJ, concur.